UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| SCOTT MATALON, | ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | Civil Action No. 13-10001-LTS |
| MARY ANN O'NEILL and JOSEPH HYNES, | ) ) ) ) | |
| Defendants. | ) ) | |

MEMORANDUM AND ORDER ON DEFENDANT'S
MOTION FOR JUDGMENT AS A MATTER OF LAW OR FOR A NEW TRIAL

March 13, 2015

SOROKIN, J.

This action is before the Court on Defendant Sergeant Mary Ann O'Neill's Motion for Judgment as a Matter of Law or for a New Trial. Doc. No. 127. After a four-day trial, a jury returned a verdict in favor of Plaintiff Scott Matalon on two counts: unreasonable search as to Sergeant O'Neill and excessive force as to Officer Joseph Hynes. The jury found for Defendants on the remaining counts. In her Motion, Sergeant O'Neill argues that she is entitled to judgment as a matter of law on the basis of qualified immunity or, alternatively, that she is entitled to a new trial on the ground that the Court erroneously refused to give a requested jury instruction on the community caretaker function. After careful consideration and for the reasons that follow, the Motion is DENIED.

I.      FACTS[1]

Plaintiff Scott Matalon is the owner of a single-family home located at 16 Farrington Avenue in Brighton, Massachusetts. Farrington Avenue is a residential street that runs perpendicular to Harvard Avenue, beginning at Harvard Avenue and extending some distance beyond Matalon's home. As Farrington Avenue proceeds east from its origin at Harvard Avenue, the first cross street is Highgate Street. Highgate Street proceeds only north off of Farrington (that is, a left turn when proceeding east on Farrington from the direction of Harvard Avenue). There is a single-family home located on the northeast corner of Highgate and Farrington—14 Farrington Avenue—with its main entrance on Farrington Avenue. The adjacent house, further east but also on the north side of Farrington, is Matalon's home. The front door and front porch of Matalon's home, however, do not face Farrington Avenue. Rather, the "front" of the home—meaning the side of the home containing the porch and main entrance—faces the side yard separating Matalon's home and the residence at 14 Farrington, although Matalon's porch steps face Farrington Avenue, not the side yard. The side of Matalon's home abutting Farrington Avenue does not contain a door. Matalon's home abuts residences on all other sides.

Harvard Avenue, unlike Farrington Avenue, is a commercial street. The Camino Real Restaurant is located at 48 Harvard Avenue in the building at the corner of Harvard Avenue and Farrington Avenue. The Camino Real faces Harvard Avenue a short distance north of the intersection with Farrington Avenue. There is an alley or driveway that runs behind the building,

---

[1] When a claim of qualified immunity is raised after a jury verdict, the Court "construe[s] the evidence in the light most favorable to the party that prevailed at trial, giving 'deference . . . to the jury's discernible resolution of disputed factual issues.'" Raiche v. Pietroski, 623 F.3d 30, 35 (1st Cir. 2010) (quoting Iacobucci v. Boulter, 193 F.3d 14, 23 (1st Cir. 1999)). The following facts are taken from the evidence presented at trial, construed in the light most favorable to Matalon. At a later point in this Memorandum, the Court discusses some additional facts cited by Sergeant O'Neill which are not within the set of facts most hospitable to the verdict.

parallel to Harvard Avenue, and exits onto Farrington Avenue between Harvard Avenue and Highgate Street.

On September 29, 2010, Felix Augusto-Perez was working at the Camino Real. At approximately 11:20 a.m., when the restaurant was closed, Mr. Augusto-Perez saw something suspicious and went into the office in the basement to investigate. In the office, Mr. Augusto-Perez saw a large black male taking money from the restaurant's safe. Mr. Augusto-Perez confronted the robber who brandished a weapon and fled up the stairs and out of the restaurant. Mr. Augusto-Perez, followed by another employee, chased the robber out the back door of the restaurant. The robber ran down the alley behind the restaurant and then turned left on Farrington Avenue. Shortly thereafter, with Mr. Augusto-Perez in pursuit, the robber turned left onto Highgate Street. Mr. Augusto-Perez lost sight of the individual when he turned right off Highgate Street into the backyard of 14 Farrington Avenue.

About the time when Mr. Augusto-Perez lost sight of the robber, he called the police to report the robbery. On the call, Mr. Augusto-Perez stated that the robber pointed a knife at him in the basement of the restaurant, although sometime later he told the police that the weapon was, in fact, a screwdriver. A police radio call dispatched officers to the location to respond to an armed robbery and described the suspect as a black male wearing a red shirt.

The first police officer to arrive on the scene was Officer Elvin Aviles, who arrived at the Camino Real at approximately 11:30 a.m. Mr. Augusto-Perez described to Officer Aviles what had just occurred, reported that about $9,000 had been taken from the safe, and walked Officer Aviles along the route of the chase.

Officer Joseph Hynes also responded to the dispatch regarding the armed robbery. A subsequent radio call, received en route, informed Officer Hynes that the suspect had been

chased down Farrington Avenue, so he and his partner, Officer Daryl Tran, drove down Farrington Avenue. On Farrington, the officers were flagged down by an unidentified individual standing on the south side of Farrington somewhere between Highgate and 16 Farrington who indicated to the officers that he had seen a black male run down the walkway between 14 and 16 Farrington.[2] The officers parked their cruiser on Farrington Avenue and proceeded down the walkway towards the backyard of 16 Farrington until they were about even with the front door of the home.

Shortly after Officers Hynes and Tran arrived at 16 Farrington, Sergeant Mary Ann O'Neill joined them at that location. Sergeant O'Neill walked up the steps—which face Farrington Avenue—and onto the porch of 16 Farrington. She looked through a glass pane in the single-family home's closed exterior door and could see an interior vestibule door open; she could also see what appeared to be a door from the first floor to the home's basement also open. She tried the door handle and, finding it unlocked, she opened the door. At this point, she stated that there was an "open door," and Officers Hynes and Tran, at this time in the side yard about even with the front door, ceased proceeding down the walkway and joined her on the porch. Sergeant O'Neill made a radio call for a K-9 unit, saying in the call that there was an "open door." More police arrived, and officers established a perimeter around the house while they

---

[2] At trial, Officer Hynes testified that an unidentified witness told him and Officer Tran that he had seen a black male running down the walkway between 14 and 16 Farrington. This testimony was challenged by Matalon in his examination of Officer Hynes. Matalon elicited testimony that Officer Hynes did not obtain identifying information from the witness and did not remember many salient facts about him. The fact that a witness placed a black male running on the walkway between 14 and 16 Farrington was not necessary to the jury's verdict and could have been rejected by the jury. Under the appropriate standard, the Court believes that this testimony is not properly considered in resolving the present Motion. See Raiche, 623 F.3d at 35. However, because this fact was not contradicted directly by affirmative evidence and because Sergeant O'Neill relies upon it in her memorandum in support of this Motion, the Court considers the addition of this fact to the qualified immunity calculus out of an abundance of caution. As is made clear below, the addition of this fact does not alter the Court's analysis on the applicability of qualified immunity.

waited for a K-9 unit to arrive.[3] Two K-9 units, Officers Garcia and Saltalamacchia, arrived within ten to fifteen minutes of Sergeant O'Neill's call. Sergeant O'Neill spoke with them and instructed them to clear the house. Officer Garcia and her dog, Cuba, entered the house with Officer Saltalamacchia as cover. Shortly thereafter, they encountered Matalon, the home's owner. The officers found no other person in the home, nor any evidence linking the home to the robbery.[4]

II.  DISCUSSION

Sergeant O'Neill brings two challenges to the jury's verdict in favor of Matalon on the unreasonable search count. First, she argues that she is entitled to judgment as a matter of law because the doctrine of qualified immunity applies to her actions. Second, she argues that she is

---

[3] In her Motion, Sergeant O'Neill cites additional facts elicited at trial, including that "Sgt. O'Neill opened the door and yelled into the residence announcing her presence on the porch . . . [but] didn't get a response" and that "one of the officers stated that he heard footsteps coming from inside the house, but no one was coming to the door upon the police ringing the bell and announcing their presence." Doc. No. 128 at 5-7. As to the lack of response to the announcements at the door, Matalon testified that the first thing he heard that morning was a police dog barking and parrots shrieking just before he went downstairs and discovered officers in his home. This contradicts the testimony of the officers that they both rang the doorbell and yelled into the house to announce their presence multiple times during the ten to fifteen minutes before the K-9 units arrived and entered the house. Similarly, as to the claim that one officer heard footsteps after police announced their presence but before their entry, Matalon testified that he got out of bed only upon hearing the dogs and the birds making noise within the house, and that he immediately went downstairs. The officers who conducted the search of the house testified that no person, other than Matalon, was found in the house. This testimony controverted that of the officer who claimed to hear footsteps after the officers announced their presence, but before the dog entered the house. Because the officers' testimony on these points was contradicted by other evidence and is inhospitable to the jury's verdict, this evidence is not properly considered in resolving the present Motion. See Raiche, 623 F.3d at 35; Jennings v. Jones, 499 F.3d 2, 7 (1st Cir. 2007). The Court notes, however, that those alleged facts, even if considered, are of no assistance to Sergeant O'Neill. Neither the lack of response to the officers' announcements nor the alleged footsteps support an inference that the robber was in the house. The Court further notes that Sergeant O'Neill did not testify to hearing footsteps. This is notwithstanding the fact, reasonably inferred from her testimony, that Sergeant O'Neill did not leave the porch from the time when she first ascended the stairs until the arrival of the K-9 units, at which point she left the porch to speak with them before their entry into the house.
[4] Because Sergeant O'Neill's Motion only challenges the unreasonable search count, the Court need not recount facts regarding what transpired after the entry into Matalon's home.

5

entitled to a new trial on the ground that the Court erroneously denied her request to instruct the jury on the community caretaker exception to the warrant requirement.

    A.    <u>Motion for Judgment as a Matter of Law</u>

Sergeant O'Neill contends that she is entitled to qualified immunity because the law was not clearly established as to her authority to enter Matalon's house pursuant to the community caretaker function and, further, that her actions were reasonable under the circumstances.[5]

To determine if qualified immunity applies, the Court must determine "(1) whether a public official has violated a plaintiff's constitutionally protected right; and (2) whether the particular right that the official has violated was clearly established at the time of the violation." <u>Raiche</u>, 623 F.3d at 35. In evaluating the second prong of the qualified immunity test, the Court considers "(a) the clarity of the law in general at the time of the alleged violation; and (b) the clarity of the law as applied to the case—in other words, whether a reasonable person in the defendant's shoes 'would have understood that his conduct violated the Plaintiff['s] constitutional rights.'" <u>Id.</u> at 36 (quoting <u>Maldonado v. Fontanes</u>, 568 F.3d 263, 269 (1st Cir. 2009)). This analysis flows from the fact that qualified immunity is intended to protect "all but the plainly incompetent or those who knowingly violate the law." <u>Malley v. Briggs</u>, 475 U.S. 335, 341 (1986); <u>accord</u> <u>Lopera v. Town of Coventry</u>, 640 F.3d 388, 396 (1st Cir. 2011). While there need not be "a case directly on point" for law to be clearly established for the qualified

---

[5] Sergeant O'Neill very briefly suggests that the exigent circumstances, emergency aid, and community caretaker exceptions justified the warrantless entry into Matalon's home. Doc. No. 128 at 4. To the extent Sergeant O'Neill is arguing that she is entitled to judgment as a matter of law on the ground that these exceptions applied to the search of Matalon's home, the Court rejects that argument. The jury was instructed on two exigent circumstance theories: emergency aid and threat to public safety. The jury found those exceptions did not apply, and Sergeant O'Neill has cited nothing to disturb that finding. As to the community caretaker function, Sergeant O'Neill has not cited case law establishing that the exception applies to the facts of this case. As fleshed out more fully below, Sergeant O'Neill can point to no case that applies the exception to uphold a search where the facts justifying the search lack a nexus to the place searched.

immunity analysis, "existing precedent must have placed the statutory or constitutional question beyond debate." Ashcroft v. al-Kidd, 131 S. Ct. 2074, 2083 (2011).

Looking first to whether Sergeant O'Neill violated a constitutional right of Matalon, in light of the facts set forth above, the jury reasonably could have concluded that the officers' relevant knowledge consisted only of the following: (1) the victim reported last seeing the robber turning east off Highgate Street into the backyard of 14 Farrington Avenue, (2) an unidentified witness told Officer Hynes that the witness saw a man running down the walkway between 14 and 16 Farrington Avenue, (3) the door to Matalon's home was closed and unlocked; and (3) two interior doors in Matalon's home—the door from the first floor to the basement and the interior vestibule door—were open. The officers had no evidence whatsoever that the robber entered Matalon's home or even went up on the porch of his home.

Matalon had the right under the Fourth Amendment for his home to be free from entry and search by the police unless the police obtained a search warrant or one of the "well-delineated exceptions" to that rule applied. United States v. Romain, 393 F.3d 63, 68 (1st Cir. 2004). Further, if police sought to enter and search his home on the basis of an exception to the warrant requirement, Matalon had the right under the Fourth Amendment for his residence to be free from search unless a nexus existed between his home and the facts justifying the warrantless entry. See, e.g., Michigan v. Fisher, 558 U.S. 45, 47 (2009) (per curiam) (noting that the emergency aid exception requires "an objectively reasonable basis for believing . . . that a person within [the house] is in need of immediate aid") (quoting Brigham City v. Stuart, 547 U.S. 398, 406 (2006), and Mincey v. Arizona, 437 U.S. 385, 392 (1978)) (internal quotation marks omitted); Cady v. Dombrowski, 413 U.S. 433, 448 (1973) (finding community caretaking search of car trunk reasonable because "the officer reasonably believed [the trunk] to contain a gun").

7

Thus, a reasonable jury could have and did find Sergeant O'Neill violated Matalon's Fourth Amendment right for his home to be free from search in the absence of a warrant and any nexus between his home and the facts supporting any exception to the warrant requirement.

As to the second qualified immunity inquiry, certain principles are clearly established. The Fourth Amendment to the United States Constitution provides that:

> [t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV. The Fourth Amendment, and the particularity requirement contained therein, arose as a response "to the reviled 'general warrants' and 'writs of assistance' of the colonial era, which allowed British officers to rummage through homes in an unrestrained search for evidence of criminal activity." Riley v. California, 134 S. Ct. 2473, 2494 (2014).

"The Fourth Amendment's prohibition against unreasonable searches and seizures has always been interpreted to prevent a search that is not limited to the particularly described 'place to be searched, and the persons or things to be seized . . . .'" Florida v. Royer, 460 U.S. 491, 499 (1983) (quoting U.S. Const. amend. IV). Freedom from governmental intrusion in one's home, in particular, lies "[a]t the very core of the Fourth Amendment." Kyllo v. United States, 533 U.S. 27, 31 (2001) (quoting Silverman v. United States, 365 U.S. 505, 511 (1961)) (internal quotation marks omitted). Indeed, "[i]t is a well-established principle of Fourth Amendment law that warrantless searches inside a home are presumptively unreasonable." United States v. Samboy, 433 F.3d 154, 158 (1st Cir. 2005). Notwithstanding this special protection of the home, several exceptions to the warrant requirement exist that allow officials to enter and search a residence without a warrant, including hot pursuit of a fleeing felon, provision of emergency aid,

a threat to the lives or safety of the public or police, and the community caretaker function.[6] United States v. Martins, 413 F.3d 139, 146-47 (1st Cir. 2005); United States v. Rodriguez-Morales, 929 F.2d 780, 785 (1st Cir. 1991). Each of these exceptions, however, requires a nexus between the justification for warrantless entry and the place to be entered. See Welsh v. Wisconsin, 466 U.S. 740, 753 (1984) (hot pursuit); Cady, 413 U.S. at 448 (1973) (community caretaking function); Martins, 413 F.3d at 147 (emergency aid); United States v. Irizarry, 673 F.2d 554, 558 (1st Cir. 1982) (safety threat).

Applying these well-known principles to the facts of this case as the jury could have found them, Sergeant O'Neill's decision to authorize a warrantless entry into the home violated clearly established Fourth Amendment principles. Sergeant O'Neill possessed nothing more than a hunch that the robber was within Matalon's home. Such a hunch may have warranted some further investigation. Sergeant O'Neill's hunch, however, did not justify escalating the investigation into a warrantless, nonconsensual entry by armed officers into the sanctity of Matalon's home. See Terry v. Ohio, 392 U.S. 1, 22 (1968) (noting that "intrusions upon constitutionally guaranteed rights based on nothing more substantial than inarticulate hunches[] [is] a result this Court has consistently refused to sanction").

Sergeant O'Neill simply lacked a basis to link the facts she knew about the robber's flight to the interior of the home. Information that a suspect was fleeing through a yard in a dense residential neighborhood, without more, is not a sufficient basis to ground an entry and search of the interior of a home sitting adjacent to a known flight path. Cf. United States v. Joubert, No. 14-1259, 2015 WL 544928, at *3-5 (1st Cir. Feb. 11, 2015) (discussing the nexus requirement

---

[6] The Court notes that the First Circuit has not decided the question of whether the community caretaking function can ever justify warrantless entry into a person's residence. MacDonald v. Town of Eastham, 745 F.3d 8, 13, 15 (1st Cir. 2014). For the purposes of this Motion, the Court assumes, without deciding, that it can.

for search warrants). This is particularly so when the report from the witness identifying himself to the officers, Mr. Augusto-Perez, pointed in a different direction than the area between Matalon's home and his neighbor's home. Mr. Augusto-Perez observed the perpetrator in a different location (behind 14 Farrington rather than on walkway in 16 Farrington's side yard), proceeding in a different direction (eastbound behind 14 Farrington from the direction of Highgate rather than northbound[7] in the side yard of 16 Farrington from the direction of Farrington) than was reported by the witness from whom officers neither received nor obtained any identifying information. Moreover, none of the facts occurring after the unidentified witness's statement support the officers' belief that the robber was inside Matalon's house, including the unlocked front door or open interior doors. These facts create no nexus between the robber's flight path and the home's interior and are no more consistent with the robber fleeing into the house than they are with the robber entering 14 Farrington (which was equally close to the flight path reported by the unidentified witness and closer to the robber's last location as reported by the identified witness), hiding in the yard behind 16 Farrington, hiding in or fleeing through the yards and homes adjacent to 16 Farrington, or fleeing towards Linden Street. Accordingly, qualified immunity does not shield her from liability for her entry into the home.

Several other facts support this conclusion. The witness, according to Officer Hynes, was standing across the street from Matalon's house somewhere east of Highgate Street but west of 16 Farrington—an ideal vantage point to see the robber ascend Matalon's porch on the steps

---

[7] The testimony at trial does not establish expressly that the unidentified witness reported the black male running northbound, that is, away from Farrington and toward the backyard of Matalon's property, however, that is the reasonable inference drawn both from the officer's actions and the witness's use of the word "down." In any event, had the unidentified witness reported the black male running southbound—from Matalon's backyard toward Farrington—such a report would undermine rather augment the Sergeant's motion.

10

facing Farrington and enter the home. Yet, the witness communicated no such observation, the testimony was only that the witness stated that a black male ran down the walkway between 14 and 16 Farrington. Officer Hynes and his partner followed this path, but stopped while roughly parallel to the front door and turned back to reach the porch steps (which face Farrington rather than the side yard) without ever reaching the backyard of Matalon's home. They did so only because Sergeant O'Neill was on the porch and had stated that there was an "open door." Sergeant O'Neill had no additional information suggesting that the robber had entered the house. Further, the ten to fifteen minutes in which the officers waited for the K-9 unit to arrive further dissipated rather than strengthened the notion that something was amiss within Matalon's home. Thus, the totality of the facts did not provide any basis for police to reasonably conclude that the robber had entered the residence and, therefore, a reasonable officer would not have believed those facts to justify a warrantless, nonconsensual entry into Matalon's home.

Notably, Sergeant O'Neill cites no authority for the application of qualified immunity to such a set of facts. The First Circuit's recent decision of MacDonald v. Town of Eastham, 745 F.3d 8 (1st Cir. 2014), supports rather than undermines the Court's conclusion. In that case, a neighbor called police out of concern arising from the neighbor's observation of an entry door left ajar at a nearby house when the residents of that house appeared to be absent. Id. at 10-11. The police responded, verified the report with the neighbor, observed the open entry door at the house, and received no response from within the home when they announced their presence at the door. Id. at 11. In contrast to this case, the officers in MacDonald possessed concerning facts specifically tied to the home in question, which provided a nexus between the justification and the entry.

11

Similarly, implicit in the other cases Sergeant O'Neill cites in support of her Motion is the premise that the threat requiring police community-caretaking intervention must be linked with the place or item acted upon for that purpose. See United States v. Coccia, 446 F.3d 233, 240 (1st Cir. 2006) (holding the seizure of a car to be reasonable where police had "a concern that [the defendant's] car might contain items constituting a threat to public safety"); Rodriguez-Morales, 929 F.2d at 785 (noting that the seizure of a car was supported by "a legitimate reason for stopping the car and a strong noninvestigatory justification for removing it from the highway"); Barbosa v. Hyland, Civ. A. No. 11-11997-JGD, 2013 WL 6244157, at *26 (D. Mass. Dec. 2, 2013) (finding the community caretaker exception did not apply where the officer's purported concern for persons within the home was not substantiated). There is simply no support for the proposition that the law was unclear on this point.

One final point bears mention. Sergeant O'Neill appears to take the position that the law governing community-caretaking entries into a dwelling is unsettled and that it follows, a fortiori, that qualified immunity shields her entry into the home. This reasoning misunderstands the nature of qualified immunity and would eviscerate a substantial body of Fourth Amendment law protecting the home that dates back to the enactment of the Constitution. The question is whether, in light of the relevant facts, Sergeant O'Neill violated a clearly established constitutional right of Matalon, defined at "an appropriate level of generality." Hunt v. Massi, 773 F.3d 361, 367-68 (1st Cir. 2014) (quoting Brady v. Dill, 187 F.3d 104, 115 (1st Cir. 1999)). For the reasons stated above, she did, even though the law regarding the community caretaking function as applied in other contexts may be unsettled and may give rise to qualified immunity. See MacDonald, 745 F.3d at 15.

B. <u>Motion for a New Trial</u>

Sergeant O'Neill also argues that she is entitled to a new trial due to the Court's alleged instructional error. At the charge conference, Sergeant O'Neill requested an instruction on the community caretaking function as an exception to the warrant requirement.[8] The Court declined to give such an instruction in its charge to the jury. In support of her argument that the Court's refusal to do so entitles her to a new trial, Sergeant O'Neill contends that, "under the community caretaking exception, neither a warrant, nor probable cause is needed to enter, which is a lower standard than what was included in the jury instructions," and that, "[h]ad the jury been instructed on the lower standard of the community caretaking exception, the jury may not have found Sgt. O'Neill liable for the wrongful search . . . ." Doc. No. 128 at 10. Sergeant O'Neill did not make clear in her proposed instructions or in her motion papers what "lower standard" applies in the community caretaking context. In colloquies with the Court, however, she argued that reasonable suspicion is sufficient for entry into a residence on the basis of the community caretaking function. The Court treats the Motion as claiming error in the failure to instruct the

---

[8] The requested instruction reads as follows:

> Another exception to the warrant requirement is the community caretaking function. This exception applies in cases of pure emergency, where police entry of a dwelling is effected solely to avert a dangerous situation that threatens life or safety, and not for criminal investigatory purposes. In such cases, neither a warrant, nor probable cause is needed to enter. The community caretaking exception recognizes that the police perform a multitude of community functions apart from investigating crime. In performing this community caretaking role, police are expected to aid those in distress, combat actual hazards, prevent potential hazards from materializing and provide an infinite variety of services to preserve and protect public safety. The role of a police officer includes preventing violence and restoring order, not simply rendering first aid to casualties. . . . As long as entrance in a dwelling pursuant to the community caretaking function is not a mere ploy for investigation, the coexistence of investigatory and caretaking motives will not invalidate the search.

Doc. No. 92 at 2 (citations and internal quotation marks omitted).

jury that the community caretaker doctrine may authorize a warrantless entry into the home, provided reasonable suspicion supported the entry.

It is error for a court to refuse a particular instruction if the proffered instruction was "(1) correct as a matter of substantive law, (2) not substantially incorporated into the charge as rendered, and (3) integral to an important point in the case." Faigin v. Kelly, 184 F.3d 67, 87 (1st Cir. 1999) (quoting Elliott v. S.D. Warren Co., 134 F.3d 1, 6 (1st Cir. 1998)). It follows that "a court need not accept a particular instruction if it does not accurately state the law." Wilson v. Mar. Overseas Corp., 150 F.3d 1, 10 (1st Cir. 1998). Further, a party is not entitled to an instruction that is not supported by the evidence at trial. Gillespie v. Sears, Roebuck & Co., 386 F.3d 21, 32 (1st Cir. 2004). Even if the Court committed error in refusing a proffered instruction, "[a]n erroneous jury instruction necessitates a new trial only if the error could have affected the result of the jury's deliberations." Colon-Millin v. Sears Roebuck De P.R., Inc., 455 F.3d 30, 41 (1st Cir. 2006) (quoting Allen v. Chance Mfg. Co., 873 F.2d 465, 469 (1st Cir. 1989)).

Here, insofar as Sergeant O'Neill was requesting an instruction to the effect that the community caretaker function allows police to enter a dwelling on "reasonable suspicion," the proposed instruction is not accurate as a matter of substantive law. The cases that analyze the community caretaker function speak of reasonableness as the touchstone of community caretaking activities. See Cady, 413 U.S. at 447-48; MacDonald, 745 F.3d at 12; Rodriguez-Morales, 929 F.2d at 785. Sergeant O'Neill has cited to no case—and the Court is aware of no case—which stands for the proposition that "reasonable suspicion" governs police entry into a residence on the basis of their community caretaker function.[9] Nor do the Fourth Amendment

---

[9] The Court notes that Sergeant O'Neill has not developed any detailed explanation supporting the application of reasonable suspicion in this context.

14

principles supporting detention of individuals for brief periods of time based only on reasonable suspicion apply in the context of an entry into the "sanctity of a man's home and the privacies of life." Oliver v. United States, 466 U.S. 170, 180 (1984) (quoting Boyd v. United States, 116 U.S. 616, 630 (1886)). Terry stops premised on reasonable suspicion involve "brief and narrowly circumscribed intrusions," Dunaway v. New York, 442 U.S. 200, 212 (1979), while entry into a person's home is an invasion of a much greater magnitude and into a much more protected space. People regularly endure delays, stops, and interference as they move about the world. Unauthorized entries into one's home are virtually non-existent.

Insofar as Sergeant O'Neill was requesting an instruction that, under the community caretaker function, "neither a warrant, nor probable cause is needed to enter" a dwelling (that is, the instruction actually proposed), Doc. No. 92 at 2, such an instruction was likely to mislead the jury and not supported by the evidence. As requested, it was likely to mislead the jury because the instruction did not inform the jury that the police must exercise the community caretaker function reasonably, nor did it include any other limiting principle to inform the jury that the police may not enter every residence that happens to be in the vicinity of an emergency. See Estate of Keatinge v. Biddle, 316 F.3d 7, 17 (1st Cir. 2002) (affirming a district court's refusal to give particular jury instructions that had the potential to mislead). The proposed instruction essentially authorizes the very invasions into the home the Founders sought to prohibit by adopting the Fourth Amendment. See Riley, 134 S. Ct. at 2494.

The proffered instruction also was not supported by the evidence because, as the Court explained at the charge conference, the only fair reading of the evidence was that Sergeant O'Neill and the other officers converged on 16 Farrington Avenue to locate and apprehend an armed robber. The evidence established that the police believed, reasonably or otherwise, that an

armed robber was in the house, and that they called for a K-9 unit and waited fifteen minutes for its arrival, for the purpose of locating and apprehending the suspect. This was not a case where the entry into the home was "effected solely to avert a dangerous situation that threaten[ed] life or safety, and not for criminal investigatory purposes," Doc. No. 92 at 2, as Sergeant O'Neill's proposed instruction stated (and the case she cites in her memorandum held).[10] For these reasons, the Court's refusal to provide the requested instruction to the jury was not error and does not entitle Sergeant O'Neill to a new trial.

III. CONCLUSION

For the reasons set forth above, Sergeant O'Neill's Motion for Judgment as a Matter of Law or for a New Trial, Doc. No. 127, is DENIED.

SO ORDERED.

  /s/ Leo T. Sorokin
Leo T. Sorokin
United States District Judge

---

[10] The Court is not deciding the scope of the community caretaking function as it applies to the home or the extent to which the police may hold investigatory motives while executing a search pursuant to the community caretaking function. The Court is deciding only that the facts of this case did not support the proffered instruction.