# United States Court of Appeals
## For the First Circuit

---

No. 15-1372

SCOTT MATALON,

Plaintiff, Appellee,

v.

JOSEPH HYNNES and MARY ANN O'NEILL,

Defendants, Appellants,

CITY OF BOSTON,

Defendant.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Leo T. Sorokin, U.S. District Judge]

---

Before

Howard, Chief Judge,
Selya and Stahl, Circuit Judges.

---

Nicole M. O'Connor, Assistant Corporation Counsel, City of
Boston Law Department, with whom Eugene L. O'Flaherty, Corporation
Counsel, and Katherine N. Galle, Assistant Corporation Counsel,
were on brief, for appellants.
Robert S. Sinsheimer, with whom Wesley B. Stoker and
Sinsheimer & Associates were on brief, for appellee.

---

November 18, 2015

---

**SELYA**, **Circuit Judge**.  This case requires us to inspect the topography of the seldom-used exception to the Fourth Amendment's warrant requirement for warrantless searches by police officers exercising community caretaking functions.  The case arises in the context of a warrantless entry by the appellants (Boston police officers) into a dwelling in the Brighton neighborhood of Boston, Massachusetts.  The police lacked probable cause; the jury found that their intrusion into the dwelling was not justified either by exigent circumstances or by any other constitutionally acceptable rationale; and an award of damages against the officer who had spearheaded the entry into the house ensued.

The affected appellant, relying on the doctrine of qualified immunity and the community caretaking exception, invites us to set aside this verdict.  After careful consideration, we decline her invitation. We also reject the appellants' contention that the district court's award of attorneys' fees is infirm because the court failed to distinguish between "core" and "non-core" work performed by the prevailing party's lawyers. Accordingly, we affirm the judgment below.

**I.  BACKGROUND**

On September 29, 2010, the Boston police received a report of a robbery from Felix Augusto-Perez, the manager of a restaurant located at 48 Harvard Avenue.  Officer Elvin Aviles

responded, and Augusto-Perez recounted that he had discovered a
black male removing money from a safe in the basement of the
restaurant.  Augusto-Perez told Aviles that he had chased the thief
out of the back door of the restaurant and along Farrington Avenue
(which runs perpendicular to Harvard Avenue).  The robber turned
left on Highgate Street (which runs roughly parallel to Harvard
Avenue) and then turned right, running into the back yard of a
house at 14 Farrington Avenue.  Aviles radioed to other officers
that the suspect was last seen in the area of Farrington Avenue
and Highgate Street.

        The appellants — Sergeant Mary Ann O'Neill and Officer
Joseph Hynnes — were among the officers who responded.  Hynnes
testified that when he arrived at Farrington Avenue, an
unidentified witness reported seeing a black male running down a
walkway between 14 Farrington Avenue and 16 Farrington Avenue.
After receiving this information, Hynnes and his partner proceeded
down the walkway between the houses.  They encountered O'Neill.

        Though O'Neill's recollection at trial was hazy, she
recalled "a victim" pointing in the direction of 16 Farrington
Avenue and Hynnes telling her about what he had learned.  O'Neill
then mounted the porch of the dwelling at 16 Farrington Avenue
(which faced the walkway).  Looking through a glass pane on the
closed exterior door, she could see two open doors, the first
leading into the main living area and the second apparently leading

into the cellar.  O'Neill tried the knob of the exterior door and found it unlocked.  She then rang the bell, knocked on the door, and called into the house, all to no avail.  Hynnes told O'Neill that he thought that he heard footsteps emanating from the second floor of the dwelling.[1]

O'Neill called for a canine unit.  After a wait of at least ten minutes, the canine unit arrived and a search of the residence ensued.  The only person inside was the owner, plaintiff-appellee Scott Matalon, who had been sleeping in an upstairs bedroom.  Displeased by the intrusion, the plaintiff had words with the officers and was eventually arrested by Hynnes.

After the plaintiff's acquittal on criminal charges resulting from his arrest, he invoked 42 U.S.C. § 1983 and sued O'Neill, Hynnes, and the City of Boston in the federal district court.  As relevant here, he charged O'Neill with violating his

---

[1] A few of the facts recounted to this point — the unidentified witness's statements to Hynnes, O'Neill's claim that efforts were made to announce the presence of officers before entering the dwelling, and Hynnes's statement that he had heard footsteps — were disputed at trial.  The district court held that these facts were not part of the factual mosaic to be considered in ruling on O'Neill's motion for judgment as a matter of law.  See Matalon v. O'Neill (Matalon I), No. 13-10001, 2015 WL 1137808, at *2 nn.2-3 (D. Mass. Mar. 13, 2015).  That ruling was correct.  See, e.g., Iacobucci v. Boulter, 193 F.3d 14, 23 (1st Cir. 1999) (explaining that when reviewing a claim of qualified immunity post-trial, the evidence must be construed in the light most favorable to the jury's verdict).  Nevertheless, we include them here, as they do not affect the result of the qualified immunity analysis.

civil rights through an unreasonable search and charged Hynnes with violating his civil rights through the use of excessive force. Following a four-day trial, the jury found for the plaintiff on both of these claims and awarded him $50,000 in damages.[2]

At the close of all the evidence, O'Neill moved for judgment as a matter of law based on qualified immunity and the community caretaking exception to the Fourth Amendment's warrant requirement. The court reserved decision and O'Neill renewed the motion post-verdict. She also moved for a new trial, positing instructional error. The district court denied both of her motions. See Matalon v. O'Neill (Matalon I), No. 13-10001, 2015 WL 1137808, at *8 (D. Mass. Mar. 13, 2015).

Having prevailed, the plaintiff moved for attorneys' fees and costs. See 42 U.S.C. § 1988(b). The district court granted the motion, awarding the plaintiff the sum of $134,642.35. See Matalon v. O'Neill (Matalon II), No. 13-10001, 2015 WL 1206343 (D. Mass. Mar. 17, 2015). This timely appeal ensued.

**II. ANALYSIS**

O'Neill attacks the denial of both her motion for judgment as a matter of law and her motion for a new trial. O'Neill

---

[2] Hynnes has not challenged the excessive force verdict, so we omit any discussion of the facts peculiar to that claim.

and Hynnes jointly attack the amount of the fee award.  We discuss
these claims of error sequentially.

### A.  Judgment as a Matter of Law.

We review the denial of a motion for judgment as a matter
of law de novo, viewing the evidence in the light most hospitable
to the jury's verdict and drawing all reasonable inferences in
favor of that verdict.  See Fresenius Med. Care Holds., Inc. v.
United States, 763 F.3d 64, 67-68 (1st Cir. 2014).  In conducting
this review, we are not bound by the lower court's conclusions of
law but, rather, may affirm on any basis made manifest by the
record.  See Peguero-Moronta v. Santiago, 464 F.3d 29, 34 (1st
Cir. 2006); see also InterGen N.V. v. Grina, 344 F.3d 134, 141
(1st Cir. 2003).

At its core, qualified immunity is a judge-made doctrine
that maintains a delicate equilibrium between "two important
interests — the need to hold public officials accountable when
they exercise power irresponsibly and the need to shield officials
from harassment, distraction, and liability when they perform
their duties reasonably." Pearson v. Callahan, 555 U.S. 223, 231
(2009).  To that end, qualified immunity shields government
officials "from liability for civil damages insofar as their
conduct does not violate clearly established statutory or
constitutional rights of which a reasonable person would have
known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  This

construct "gives government officials breathing room to make reasonable but mistaken judgments about open legal questions," Ashcroft v. al-Kidd, 131 S. Ct. 2074, 2085 (2011), while simultaneously exposing to liability officials who — from an objective standpoint — should have known that their actions violated the law, see Pagán v. Calderón, 448 F.3d 16, 31 (1st Cir. 2006).

Examining a claim of qualified immunity typically requires a two-step analysis.  At the first step, an inquiring court must explore "whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right." Pearson, 555 U.S. at 232 (citations omitted).  At the second step, the court must determine "whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." Id. (quoting Saucier v. Katz, 533 U.S. 194, 201 (2001)); see Haley v. City of Boston, 657 F.3d 39, 47 (1st Cir. 2011).  The court need not engage in this two-step pavane sequentially, but may alter the choreography in the interests of efficiency.  See Pearson, 555 U.S. at 236; Haley, 657 F.3d at 47.  This point is salient here, as O'Neill confines her appeal of the verdict to the question of

whether the governing law was clearly established at the time of the search.[3]

This inquiry demands its own two-part analysis. First, we must focus "on the clarity of the law at the time of the alleged civil rights violation." Maldonado v. Fontanes, 568 F.3d 263, 269 (1st Cir. 2009). Such an assessment "turns on whether the contours of the relevant right were clear enough to signal to a reasonable official that his conduct would infringe that right." MacDonald v. Town of Eastham, 745 F.3d 8, 12 (1st Cir. 2014). Once that half of the inquiry is complete, we must appraise the facts of the case to determine "whether a reasonable defendant would have understood that his conduct violated the plaintiff['s] constitutional rights." Maldonado, 568 F.3d at 269. In making this appraisal, it is not necessary that the particular factual scenario has previously been addressed and found unconstitutional: "officials can still be on notice that their conduct violates established law even in novel factual circumstances." Hope v. Pelzer, 536 U.S. 730, 741 (2002).

In the case at hand, the background principle of law is the Fourth Amendment, which shields individuals from "unreasonable searches and seizures." U.S. Const. amend. IV. It is common

---

[3] The plaintiff asserts that O'Neill has waived her qualified immunity claim. Because the claim is easily resolved on the merits, we have no occasion to test this assertion.

ground that a man's home is his castle and, as such, the home is shielded by the highest level of Fourth Amendment protection. See United States v. Martins, 413 F.3d 139, 146 (1st Cir. 2005). Thus the law, at the time of the search, was clearly established that "[a] warrantless police entry into a residence is presumptively unreasonable unless it falls within the compass of one of a few well-delineated exceptions" to the Fourth Amendment's warrant requirement. United States v. Romain, 393 F.3d 63, 68 (1st Cir. 2004).

O'Neill attempts to seek refuge in one of the lesser known of these exceptions: the community caretaking exception. This exception has its genesis in the Supreme Court's decision in Cady v. Dombrowski, 413 U.S. 433 (1973). There, the Court examined a warrantless search of a car that had been towed following a traffic accident to secure a gun believed to be in the vehicle. See id. at 436-37. The Court held that the search was reasonable and did not violate the Fourth Amendment as the officers were engaged in "community caretaking functions." Id. at 441.

Since Cady, the community caretaking exception has evolved into "a catchall for the wide range of responsibilities that police officers must discharge aside from their criminal enforcement activities." United States v. Rodriguez-Morales, 929 F.2d 780, 785 (1st Cir. 1991). The case law concerning community caretaking functions most often has involved actions by police

- 9 -

officers with respect to motor vehicles.  See, e.g., Cady, 413 U.S. at 441; Rodriguez-Morales, 929 F.2d at 785.  The doctrine's applicability has been far less clear in cases involving searches of the home.  See, e.g., United States v. Tibolt, 72 F.3d 965, 969 n.2 (1st Cir. 1995) (leaving this question open); Commonwealth v. Entwistle, 973 N.E.2d 115, 127 n.8 (Mass. 2012) (same); see also MacDonald, 745 F.3d at 13 (collecting cases and noting divergence of views among courts that have grappled with this question).  Although we do not decide the question, we assume, favorably to O'Neill, that the community caretaking exception may apply to warrantless residential searches.

Even on this favorable assumption, O'Neill's claim founders.  In MacDonald — the case upon which O'Neill primarily relies — local police responded to a telephone call from a person concerned that her neighbor's door was open though he was not home. See id. at 10-11.  Unable to contact the resident, the police entered the home and, once inside, found evidence of marijuana cultivation.  See id. at 11.  We concluded that the officers were entitled to qualified immunity because their entry into the home was arguably within the scope of the community caretaking exception.  See id. at 15.

Wresting from their contextual moorings our statements in MacDonald that the doctrine was "nebulous" and surrounded by "rampant uncertainty," id. at 14, O'Neill submits that this lack

of certitude shields her actions.  But this uncertainty does not assist O'Neill's cause: while the parameters of the community caretaking exception are nebulous in some respects (such as whether the exception applies at all to residential searches), the heartland of the exception is reasonably well defined.  Some attempts to invoke the exception plainly fall outside this heartland.  This is such a case.  As we explain below, a reasonable officer standing in O'Neill's shoes should have known that her warrantless entry was not within the compass of the community caretaking exception and, thus, that her intrusion into the plaintiff's home abridged his constitutional rights.

The community caretaking exception is distinguished from other exceptions to the Fourth Amendment's warrant requirement because it "requires a court to look at the *function* performed by a police officer" when the officer engages in a warrantless search or seizure.  Hunsberger v. Wood, 570 F.3d 546, 554 (4th Cir. 2009).  The Cady Court took pains to define community caretaking functions as being "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute."  413 U.S. at 441.  Cases that do not satisfy this requirement fall outside the heartland of the community caretaking exception, and it is therefore not surprising that the courts that have addressed the exception have stressed the separation between the police's community caretaking functions and the normal work of

criminal investigation.  <u>See</u>, <u>e.g.</u>, <u>Hunsberger</u>, 570 F.3d at 554;
<u>United States</u> v. <u>Quezada</u>, 448 F.3d 1005, 1007 (8th Cir. 2006);
<u>United States</u> v. <u>Williams</u>, 354 F.3d 497, 508 (6th Cir. 2003);
<u>People</u> v. <u>Ray</u>, 981 P.2d 928, 938 (Cal. 1999) (plurality opinion);
<u>People</u> v. <u>Davis</u>, 497 N.W.2d 910, 920 (Mich. 1993); <u>State</u> v. <u>White</u>,
168 P.3d 459, 466-67 (Wash. Ct. App. 2007); <u>cf.</u> <u>State</u> v. <u>Deneui</u>,
775 N.W.2d 221, 241 (S.D. 2009) (concluding that, even though the
initial arrival at the home was connected to a potential criminal
investigation, the entry into the home was reasonable because the
officers entered the home "not as part of a criminal investigation,
but in pursuance of their community caretaking function").

Here, the record establishes beyond hope of
contradiction that O'Neill was engaged in a quintessential
criminal investigation activity — the pursuit of a fleeing felon
in the immediate aftermath of a robbery — when she ordered the
search of the plaintiff's home.  O'Neill testified at trial that
she arrived at the plaintiff's residence after being directed there
by a witness to the crime and that she believed the suspect had
fled into the dwelling.  Thus, her actions fall far beyond the
borders of the heartland of the community caretaking exception.

In an effort to deflect this reasoning, O'Neill points
to our decision in <u>Rodriguez-Morales</u>, in which we noted that "the
coexistence of investigatory and caretaking motives will not
invalidate the [officer's challenged act]."  929 F.2d at 787.  But

in Rodriguez-Morales we addressed a situation where officers were engaged in an activity squarely within the heartland of the community caretaking function — removing a car from the highway when no occupant of the vehicle had a valid driver's license — rather than a criminal investigation. See id. at 785. Seen in this light, the quoted language signifies only that, once it has been determined that a case falls within the heartland of the community caretaking exception, the possible existence of mixed motives will not defeat the officer's claim of entitlement to the exception.

Rodriguez-Morales, like Cady and like our decision in United States v. Coccia, 446 F.3d 233, 238 (1st Cir. 2006), excludes criminal investigation activities from the purview of the community caretaking exception. After all, we were careful to explain in Rodriguez-Morales that the community caretaking exception exists to provide a rubric for analyzing "the wide range of responsibilities that police officers must discharge aside from their criminal enforcement activities." 929 F.2d at 785 (emphasis supplied). This mapping of the boundaries of the community caretaking exception accords with the cartography of every other circuit that has addressed the question.

In sum, the contours of both the plaintiff's right to enjoy the sanctity of his home and the heartland of the community caretaking exception were sufficiently clear to alert O'Neill that

her plan of action — a warrantless entry — would infringe the plaintiff's constitutional rights. Put another way, an objectively reasonable officer should have known that a warrantless entry into the plaintiff's home could not be effected on the basis of the community caretaking exception. Though the precise dimensions of the community caretaking exception are blurred, that circumstance does not mean that every attempt to resort to the exception must be regarded as arguable. See DeMayo v. Nugent, 517 F.3d 11, 18 (1st Cir. 2008). What matters here is that the exception is sufficiently defined to place O'Neill's conduct well outside its heartland and, thus, to render qualified immunity inapplicable.

We hasten to add that refusing to extend the community caretaking exception to ongoing manhunts does not unduly cramp the conduct of officers responding to potentially dangerous situations in the course of a criminal investigation. After all, there is a recognized exception to the warrant requirement for "exigent circumstances," which applies when "there is such a compelling necessity for immediate action as will not brook the delay of obtaining a warrant." Fletcher v. Town of Clinton, 196 F.3d 41, 49 (1st Cir. 1999) (quoting United States v. Almonte, 952 F.2d 20, 22 (1st Cir. 1991)). Relevant scenarios include "(1) 'hot pursuit' of a fleeing felon; (2) threatened destruction of evidence inside a residence before a warrant can be obtained; (3) a risk that the

- 14 -

suspect may escape from the residence undetected; or (4) a threat, posed by a suspect, to the lives or safety of the public, the police officers, or to herself." Hegarty v. Somerset County, 53 F.3d 1367, 1374 (1st Cir. 1995). Relatedly, a subset of the exigent circumstances rubric covers "emergency aid." Within this subset, "the police, in an emergency situation, may enter a residence without a warrant if they reasonably believe that swift action is required to safeguard life or prevent serious harm." Martins, 413 F.3d at 147; see Brigham City v. Stuart, 547 U.S. 398, 403 (2006).

These well-established exceptions to the Fourth Amendment's warrant requirement exist to permit the police to carry out their law enforcement duties in a manner that recognizes the need for quick and efficient responses to rapidly evolving situations. See Martins, 413 F.3d at 146-47; Fletcher, 196 F.3d at 49-50. Such doctrines provide ample leeway for police officers (like O'Neill) who must from time to time respond to unforeseen circumstances that arise in the course of criminal investigations. The jury here was instructed on the exigent circumstances doctrine. It found no exigency and returned a verdict for the plaintiff on the unreasonable search claim.

We summarize succinctly. In the circumstances of this case — where the officer was indisputably engaged in an ongoing criminal investigation when the warrantless search occurred — the

community caretaking exception does not apply.  There was no lack
of clarity on this point at the time the search took place.
Consequently, a reasonable officer in O'Neill's position should
have known that her intrusion into the plaintiff's home would
transgress his constitutional rights.  She was, therefore, not
entitled to qualified immunity, and the district court
appropriately denied O'Neill's motion for judgment as a matter of
law.

### B.  **Jury Instructions.**

In a related vein, O'Neill asserts that she was entitled
to a jury instruction on the community caretaking exception.  Her
proposed instruction is reprinted in the margin.[4]  The district
court disagreed, and so do we.

---

[4] O'Neill's proposed instruction is as follows:

Another exception to the warrant requirement is the
community caretaking function.  This exception applies in
cases of pure emergency, where police entry of a dwelling is
effected solely to avert a dangerous situation that threatens
life or safety, and not for criminal investigatory purposes.
In such cases, neither a warrant, nor probable cause is needed
to enter.  The community caretaking exception recognizes that
the police perform a multitude of community functions apart
from investigating crime.  In performing this community
caretaking role, police are expected to aid those in distress,
combat actual hazards, prevent potential hazards from
materializing and provide an infinite variety of services to
preserve and protect public safety.  The role of a police
officer includes preventing violence and restoring order, not
simply rendering first aid to casualties.  As long as entrance
in a dwelling pursuant to the community caretaking function
is not a mere ploy for investigation, the coexistence of

We afford plenary review to a district court's refusal to instruct on a particular claim or defense.  See Shervin v. Partners Healthcare Sys., Inc., ___ F.3d ___, ___ (1st Cir. 2015) [No. 14-1651, slip op. at 50]; Butynski v. Springfield Term. Ry. Co., 592 F.3d 272, 276 (1st Cir. 2010).  Refusal "constitutes reversible error only if the requested instruction was (1) correct as a matter of substantive law, (2) not substantially incorporated into the charge as rendered, and (3) integral to an important point in the case."  United States v. McGill, 953 F.2d 10, 13 (1st Cir. 1992).

The court below declined to give O'Neill's desired instruction on two grounds.  First, the court concluded that the instruction was incorrect as a matter of law.  See Matalon I, 2015 WL 1137808, at *6-7.  Second, the court concluded that the instruction lacked a sufficient foundation in the evidence.  See id. at *8.  We believe that the court's appraisal was accurate in both respects.

To begin, the proposed instruction stated only that, under the community caretaking exception, "neither a warrant, nor probable cause is needed to enter" a dwelling.  The proposed instruction was off-base because it omitted any description of the

investigatory and caretaking motives will not invalidate the search (citations and internal quotation marks omitted).

- 17 -

standard by which the jury was to evaluate O'Neill's search under the community caretaking exception.[5]  This omission created two problems: it not only rendered the requested instruction legally incorrect but also threatened to mislead the jury in its application of the law to the facts.  See United States v. DeStefano, 59 F.3d 1, 4 (1st Cir. 1995).

At any rate, a jury instruction is proper only if it is warranted by the evidence introduced at trial.  See Kelliher v. Gen. Transp. Servs., Inc., 29 F.3d 750, 754 (1st Cir. 1994).  The evidence in this case neither required nor supported a community caretaking instruction.

Here, the record shows with conspicuous clarity that the police were engaged in a manhunt at the time when O'Neill embarked on the search.  Thus, a reasonable jury could not have found that the officers' entry into the plaintiff's home was carried out in pursuance of a community caretaking function (or, in O'Neill's

---

[5] In ruling on O'Neill's post-trial motion, the district court gave O'Neill the benefit of the doubt and treated the proposed instruction as if it had incorporated a reasonable suspicion standard.  See Matalon I, 2015 WL 1137808, at *6-7.  But even this generous reading of the proposed instruction does not save the day: the case law has never suggested that reasonable suspicion — a standard with a defined meaning in Fourth Amendment jurisprudence, see, e.g., Martins, 413 F.3d at 149 — is the appropriate lens through which the community caretaking exception should be analyzed.  Rather, the community caretaking cases have spoken of "reasonableness," simpliciter.  See, e.g., Rodriguez-Morales, 929 F.2d at 786-87.

proposed language, that the entry "was effected solely to avert a dangerous situation" unrelated to "criminal investigatory purposes").[6]

### C. **Attorneys' Fees.**

As said, the district court awarded attorneys' fees and costs to the prevailing plaintiff in the amount of $134,642.35. This award reflected the plaintiff's successful prosecution of his unreasonable search and excessive force claims. The appellants challenge this award. Our review is for abuse of discretion. See Gay Officers Action League v. Puerto Rico (GOAL), 247 F.3d 288, 292 (1st Cir. 2001). Absent a material error of law, we will not set aside a fee award unless "it clearly appears that the trial court ignored a factor deserving significant weight, relied upon an improper factor, or evaluated all the proper factors (and no improper ones), but made a serious mistake in weighing them." Id. at 292-93.

Under the Fees Act, 42 U.S.C. § 1988(b), courts have discretion to award prevailing plaintiffs reasonable attorneys'

---

[6] Although some trial testimony suggested that O'Neill may have entertained a subjective concern about the safety of possible occupants of the dwelling, her subjective intent is not determinative of the function that she was performing when she entered the house. And in all events, an objective view of the record does not allow a finding that such a concern was the sole — or even the principal — reason for her decision to enter the dwelling.

fees in civil actions brought pursuant to 42 U.S.C. § 1983.  The lodestar approach is the method of choice for calculating fee awards.  See Perdue v. Kenny A. ex rel. Winn, 559 U.S. 542, 550-51 (2010); Coutin v. Young & Rubicam P.R., Inc., 124 F.3d 331, 337 (1st Cir. 1997).  Under this lodestar approach, a district court first "calculate[s] the number of hours reasonably expended by the attorneys for the prevailing party, excluding those hours that are 'excessive, redundant, or otherwise unnecessary.'"  Cent. Pension Fund of the Int'l Union of Operating Eng'rs & Participating Emp'rs v. Ray Haluch Gravel Co., 745 F.3d 1, 5 (1st Cir. 2014) (quoting Hensley v. Eckerhart, 461 U.S. 424, 434 (1983)).  The court then determines "a reasonable hourly rate or rates — a determination that is often benchmarked to the prevailing rates in the community for lawyers of like qualifications, experience, and competence."  Id.  Multiplying the results of these two inquiries yields the lodestar amount.  The court may then adjust the potential award based on factors not captured in the lodestar calculation.  See Hensley, 461 U.S. at 434 & n.9; Coutin, 124 F.3d at 337.

        At times, we have indicated our approval of fee awards that set two separate hourly rates for a particular attorney — one for "core" tasks like "legal research, writing of legal documents, court appearances, negotiations with opposing counsel, monitoring, and implementation of court orders" and a lower one for "non-core" tasks, which are "less demanding," such as "letter writing and

telephone conversations."  Brewster v. Dukakis, 3 F.3d 488, 492
n.4 (1st Cir. 1993).  The plaintiff's fee application in this case
assigned a single rate to each attorney, and the appellants opposed
that application on the ground that some of the time billed was
for non-core work.  Those non-core activities, the appellants said,
should be billed at two-thirds the rate applicable to core
activities.

The district court demurred, see Matalon II, 2015 WL
1206343, at *1, and used a single rate for each of the plaintiff's
lawyers (although these rates were less munificent than those that
the plaintiff had suggested).  The appellants label this refusal
an abuse of discretion.  Both the latitude ceded to district courts
in making fee awards and the flexibility inherent in the lodestar
approach counsel against the appellants' contention.

As to the former, we frequently have acknowledged the
special coign of vantage of "the trial judge, whose intimate
knowledge of the nuances of the underlying case uniquely positions
him to construct a condign award."  GOAL, 247 F.3d at 292; see
Brewster, 3 F.3d at 492.  Deferring to the reasonable judgment of
the trial court in this area recognizes that the "determination of
the extent of a reasonable fee necessarily involves a series of
judgment calls."  Lipsett v. Blanco, 975 F.2d 934, 937 (1st Cir.
1992).  In the same spirit, we traditionally have refrained from
prescribing hard and fast rules for fee awards in order to ensure

that district courts are not left "to drown in a rising tide of fee-generated minutiae."  <u>United States</u> v. <u>Metro. Dist. Comm'n</u>, 847 F.2d 12, 16 (1st Cir. 1988).

Flexibility is a hallmark of the lodestar approach.  <u>See</u> <u>id.</u>  In attempting to guide this flexibility, we have stated that "clerical or secretarial tasks ought not to be billed at lawyers' rates, even if a lawyer performs them."  <u>Lipsett</u>, 975 F.2d at 940. By the same token, we have indicated that certain components of fee awards (such as work performed in preparing and litigating fee petitions) may be calculated at discounted rates due to the comparative simplicity of the task.  <u>See</u>, <u>e.g.</u>, <u>Torres-Rivera</u> v. <u>O'Neill-Cancel</u>, 524 F.3d 331, 340 (1st Cir. 2008).  But these are not hard-and-fast rules.  Rather, they are expressions of the more general principle that calculating a reasonable fee is, for the most part, an assessment of the difficulty of the work involved and the time reasonably expended.  <u>See</u> <u>Coutin</u>, 124 F.3d at 337 n.3.  Such expressions were never meant to manifest an insistence that a district court adopt certain mechanistic procedures in calculating the lodestar.

The bottom line is that there are a variety of ways in which a trial court can fashion the lodestar.  Distinguishing between core and non-core tasks is one of those ways.  But we have never imposed a rigid requirement that a district court employ a core/non-core analysis when adjudicating a fee petition — and we

decline to impose such a requirement today. While the core/non-core distinction may be a useful tool for fashioning a reasonable fee in some cases, the choice of whether to employ that distinction is within the sound discretion of the district court. As long as the court uses permissible techniques and explains what it has done, a reviewing court's primary focus is on the reasonableness of the award. See Bogan v. City of Boston, 489 F.3d 417, 430 (1st Cir. 2007).

Here, the court elected to employ an across-the-board rate cut, rather than using two-tiered rates to determine the lodestar amount. In the circumstances of this case, that methodologic choice was not an abuse of discretion. See, e.g., Cent. Pension, 745 F.3d at 5-8 (upholding fee award which did not distinguish between core and non-core functions); United States v. One Star Class Sloop Sailboat, 546 F.3d 26, 40-42 (1st Cir. 2008) (same); Andrade v. Jamestown Hous. Auth., 82 F.3d 1179, 1189-91 (1st Cir. 1996) (same).

The appellants' back-up argument is that the district court's rationale — which did not explicitly take into account the core/non-core distinction — was inadequate to support the fee award. This is the same old whine in a different bottle, and the argument need not detain us.

The court below made pellucid that it intended to "follow[] the lodestar approach." Matalon II, 2015 WL 1206343, at

- 23 -

*1. It noted that the appellants made "no claim that Plaintiff's counsel seeks compensation for non-attorney tasks at attorney rates." Id. This is simply another way of saying that, in the court's view, the billed time did not include the sort of "clerical or secretarial tasks" that we have indicated should ordinarily be charged at lower rates. Lipsett, 975 F.2d at 940. Given this circumstance, it was reasonable for the court to conclude that it could shape the lodestar by using a single hourly rate for each attorney.

Except for the district court's decision not to employ the core/non-core distinction, the appellants do not challenge on appeal either the court's methodology or its judgment calls. We already have explained why the court was not required to use the core/non-core distinction. Viewed in this light, our primary focus must be on the reasonableness of the fee award and the clarity of the district court's explanation, that is, whether "the order awarding fees, read against the backdrop of the record as a whole . . . expose[s] the district court's thought process and show[s] the method and manner underlying its decisional calculus." Coutin, 124 F.3d at 337.

In this case, the court methodically wended its way through the fee application: it excluded some entries contained in the application; reduced the proposed hourly rates for two of the plaintiff's attorneys; set a rate equal to a paralegal for a

fledgling attorney; and cut the lodestar amount by five percent to account for claims on which the plaintiff had been unsuccessful. See Matalon II, 2015 WL 1206343, at *1-2.  Given the flexibility inherent in the lodestar approach and the wide discretion vested in a fee-setting court, we conclude that the lodestar was constructed in an acceptable manner and that the resultant fee fell within the universe of reasonable awards.  No more is exigible.

There is one loose end.  While this appeal was pending, the plaintiff moved for an order of remand to the district court so that court might fashion an award of attorneys' fees for work done on appeal.  We direct the clerk of court to deny that motion without prejudice.  Applications for awards of fees and expenses on appeal should be submitted within 30 days following the entry of a final judgment in this court.  See 1st Cir. R. 39.1(b).  We may then decide whether to resolve the fee application ourselves or remand the matter to the district court.  A remand motion, like this one, filed prior to the entry of final judgment is premature.

## III.  CONCLUSION

We need go no further.  For the reasons elucidated above, the judgment is

**Affirmed.**